**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| **GLOBALEYES** | ) |
| **TELECOMMUNICATIONS, INC.,** | ) |
| | ) |
| **Appellant,** | ) |
| | )    **Case No. 07-CV-0827-MJR** |
| **v.** | ) |
| | ) |
| **VERIZON NORTH, INC.,** | ) |
| | ) |
| **Appellee.** | ) |

**MEMORANDUM AND ORDER**

**REAGAN, District Judge:**

A.      Procedural and Jurisdictional Overview

On October 16, 2007 in adversary case No. 06-4129 (the "adversary proceeding"), the United States Bankruptcy Court issued an Order granting summary judgment from which Globaleyes Telecommunications, Inc. timely appealed to this Court. *Globaleyes Telecomm., Inc. v. Verizon N., Inc.* (*In re Globaleyes Telecomm., Inc.*) (*Globaleyes II*), No. 06-4129 (Bankr. S.D. Ill. Oct. 16, 2007) (Meyers, J.) (Doc. 69). The Court has subject-matter jurisdiction over the appeal because district courts have jurisdiction over appeals "from final judgments, orders, and decrees" of bankruptcy judges in cases referred to them. 28 U.S.C. § 158(a) (2006).

In August of 2006, Globaleyes reopened its underlying Chapter 11 Case, *In re Globaleyes Telecomm., Inc.*, No. 03-42797 (Bankr. S.D. Ill. reopened Aug. 2, 2006) (the "bankruptcy case"), which had been closed since January of 2005 after confirmation of a plan of reorganization. It then filed the adversary proceeding against Appellee Verizon North, Inc. alleging that Verizon's erroneous billing practices and fraudulent misrepresentations resulted in over-billing in excess of $750,000.00. Verizon has refunded $208,419.21, leaving roughly $550,000.00 in dispute.

The Amended Complaint in the adversary proceeding sounded in three counts against

Verizon. (No. 06-4129, Doc. 9.) Counts I and III sought to recover money damages from Verizon for alleged breaches of contract and other wrongdoing—arising entirely under Illinois state law—that pre-dated the filing of its Bankruptcy Case.[1] The Bankruptcy Court dismissed these two state law counts because it lacked the requisite subject-matter jurisdiction to hear them. *Globaleyes Telecomm., Inc. v. Verizon N., Inc.* (*In re Globaleyes Telecomm., Inc.*) (*Globaleyes I*), No. 06-4129, slip op. at 1 (Bankr. S.D. Ill. Dec. 5, 2006) (Doc. 35) (citing Fed. R. Civ. P. 12(b)(1)).

In Count II, the only surviving claim, Globaleyes objected to and requested that the Court entirely disallow Claim No. 13, in the sum of $203,193.00, filed by Verizon in the Bankruptcy Case. (Am. Compl. ¶¶ 22–23.) In support of its objection, Globaleyes asserted that Verizon had voluntarily refunded certain charges for telecommunications services that accrued, and that Globaleyes paid to Verizon, after it initiated its Bankruptcy Case on November 21, 2003 (the "Petition Date"). Both parties moved for summary judgment on Count II, and the Bankruptcy Court granted Verizon's motion. *Globaleyes II*, No. 06-4129, slip op. at 1.

Globaleyes raises 4 issues in support of its appeal:

> 1) Did the bankruptcy court err in its interpretation of the billing provisions of the First (the "First ICA") (1999 GTE Interconnection Agreement) and Second Interconnection Agreement (the "Second ICA") 2002 (Fuzion Interconnection Agreement) by determining the proportionate share usage of the special access trunks by determining internet traffic originated by Verizon is included in the data field of total usage but not allocated as Verizon originated usage?

> 2) Did the bankruptcy court err in ruling that the fraudulent misrepresentations of Verizon [Verizon stated the inability to measure a proportional share of the traffic on the interconnection trunks would have no bearing on the financial obligations of the parties] did not bar Verizon from

---

[1]       In Count I, Globaleyes alleged a pre-bankruptcy breach of contract by Verizon under Illinois state law. (Am. Compl. ¶¶ 8–20.). In Count III, Globaleyes asserted a claim against Verizon, based on conduct that allegedly occurred years prior to the Bankruptcy Case, under the Illinois Consumer Fraud and Deceptive Business Practices Act. (*Id.* ¶¶ 25–29.)

raising the contractual provisions of the First and Second Interconnection Agreement which provides that written notice of any billing dispute must be within six (6) months of the corresponding billing statement date and that any billing dispute not raised within that six (6) month period would be deemed waived?

3) Did the bankruptcy court err in dismissing Counts I and III of the amended complaint seeking affirmative relief and refund of the overcharges Verizon North collected from Globaleyes pre-petition?

4) Did the bankruptcy court err in overruling the Globaleyes objection to the proof of claim filed by Verizon North (Claim No. 13)?

### B.      The Parties

Plaintiff Globaleyes is a telecommunications carrier that provides service to customers in Illinois. Defendant Verizon furnishes numerous regulated telecommunications services and facilities to various types of customers across the United States, including other carriers. In Illinois, Verizon is one of the so-called Incumbent Local Exchange Carriers ("ILECs") that provides local telephone service over its established network. In order to provide service to its own customers, Globaleyes is required to interconnect with Verizon's network. Globaleyes does so by purchasing DS-1 or "special access" circuits from Verizon (the "Facilities"), the terms and conditions of which relationship are governed by a written Intercommunication Agreement ("ICA") between the parties.

### C.      Applicable Standards of Review

Federal Rule of Bankruptcy Procedure 8013 provides that, on appeal, the District Court "may affirm, modify, or reverse a bankruptcy judge's . . . order . . . or remand with instructions for further proceedings." Rule 8013 further provides that "[f]indings of fact, whether based on oral or documentary evidence, shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the bankruptcy court to judge the credibility of the witnesses."

Case law of this Circuit similarly instructs that a bankruptcy judge's "[f]actual findings are reviewed for clear error; [and] legal conclusions are reviewed de novo." *In re Doctors Hosp. of Hyde Park, Inc.,* 474 F.3d 421, 426 (7th Cir. 2007); *accord In re Crosswhite*, 148 F.3d 879, 881 (7th Cir. 1998); *Meyer v. Rigdon,* 36 F.3d 1375, 1378 (7th Cir. 1994). In fact, the standard of review that a district court applies on appeal from a bankruptcy judgment is the same standard that a Court of Appeals applies. *Monarch Air Service, Inc. v. Solow (In re Midway Airlines, Inc.)*, 383 F.3d 663, 668 (7th Cir. 2004). However, granting a motion for summary judgment is a legal conclusion, meaning that it is reviewed de novo. *Id.* A district court will affirm a grant of summary judgment if there are no genuine issues as to any material facts and if the moving party is entitled to judgment as a matter of law. *See id.* (citing Fed. R. Civ. P. 56(c)). A district court can also affirm a summary judgment "on any ground supported by the record, even if it was not relied upon by the court below." *See id.* (citing *Johnson v. Gudmundsson*, 35 F.3d 1104, 1115 (7th Cir. 1994)).

### D. The Facts

The following facts, taken verbatim from the challenged bankruptcy judges' summary-judgment order, are undisputed[2] with the exception of ¶¶ 18, 24 and 27, which Globaleyes challenges:

> 1. The only unresolved claim remaining in this adversary proceeding is Count II of Plaintiff's Amended Complaint. In that count, Plaintiff Globaleyes Telecommunications, Inc. ("Globaleyes") objects to and requests that the Court entirely disallow Claim No. 13, in the sum of $203,193.00, filed by Defendant Verizon North Inc. ("Verizon") in underlying Chapter 11 Case No. 03-42797 (the "Bankruptcy Case"). Claim No. 13 is comprised almost entirely of charges for certain Verizon telecommunications facilities that accrued prior to the Petition Date but were never paid by Globaleyes.

> 2. Verizon furnishes numerous regulated telecommunications services and facilities to various types of customers across the United States, including other carriers. In Illinois, Verizon is one of the so-

---

[2] At oral argument on December 4, 2009, counsel for appellant Globaleyes indicated the only factual findings with which he takes issue are found in paragraphs 18, 24 & 27 of Doc. 69 in 06-4129.

called Incumbent Local Exchange Carriers ("ILECs") that provides local telephone service over its established network.

3. Globaleyes is a telecommunications carrier that provides service to customers in Illinois. In order to provide service to its own customers, Globaleyes is required to interconnect with Verizon's network. Globaleyes does so by purchasing DS-1 or "special access" circuits from Verizon (the "Facilities"), the terms and conditions of which relationship are governed by a written Intercommunication Agreement ("ICA") between the parties.

4. The Facilities are two-way circuits that carry telecommunications traffic in both directions—*i.e.*, they transport traffic originating with Globaleyes' customers and either carried over or terminating on Verizon's network, as well as traffic originating with Verizon's customers and carried over or terminating on Globaleyes' network.

5. Globaleyes first obtained the Facilities from Verizon's predecessor, GTE North Incorporated ("GTE"), pursuant to a voluntarily negotiated ICA dated on or about October 22, 1999 (the "First ICA").

6. The provision of the First ICA governing Verizon's charges to Globaleyes for the Facilities is Section 4.2 of Article V. Sub-section 4.2.3 of that article, in particular, provided as follows:

> Special Access and/or CLEC Dedicated Transport: [Verizon] will charge special access and/or switched access rates from the applicable [Verizon] intrastate access tariff. Charges will be reduced to reflect the proportionate share of the facility that is used for transport of traffic originated by [Verizon]. The Parties will negotiate an initial factor representative of the proportionate share of the facilities. This factor will be updated quarterly in like manner or as the Parties otherwise agree.

(First ICA, Article V at § 4.2.3.)

7. The parties also agreed in Section 4.2 of that agreement, however, that "[o]nly Local Traffic and IntraLATA Toll Traffic will be used for calculation of this compensation. ESP/ISP Traffic is excluded from this compensation . . . " (First ICA, Article V at § 4.2 (emphasis added).) ESP/ISP Traffic, in turn, was defined elsewhere in the First ICA as "[t]raffic bound to any Enhanced Service Provider or Internet Service Provider." (First ICA, Article II at § 1.30.)

8. The First ICA also required Globaleyes to provide Verizon with

written notice of any billing dispute within six (6) months of the corresponding billing statement date. The parties agreed that any billing dispute not raised within such six-month period would be deemed waived. (First ICA, Article III at § 10.2.)

9. On or about December 6, 1999, Globaleyes and Verizon submitted a Joint Petition to the Illinois Commerce Commission ("ICC") in order to obtain its approval of the First ICA. The Joint Petition submitted "pursuant to 47 U.S.C. § 252(a)(1) and 252(e)," also contained the following joint representations to the ICC by Globaleyes and Verizon:

> The proposed Agreement ... was negotiated voluntarily between [Verizon] and Globaleyes. Accordingly, [Verizon] and Globaleyes are requesting approval of the Agreement pursuant to 47 U.S.C. § 252(a)(1) and 252(e).

10. Nor do agreements voluntarily negotiated between or among parties have to comply with the standards set forth in 47 U.S.C. § 251(b) & (c) or the pricing standards set forth in 47 U.S.C. § 252(d). The Joint Petition was signed on Globaleyes' behalf by its principal, Andrew Aiken. Thereafter, the First ICA was approved by the ICC.

11. Globaleyes subsequently entered into a new, voluntarily negotiated ICA with Verizon, effective as of June 21, 2002 (the "Second ICA"). In this instance, Globaleyes actually elected to adopt an ICA that Verizon had previously negotiated with another carrier, Fuzion Wireless Communications, Inc., as permitted under the Telecommunications Act of 1996.

12. The provision of the Second ICA governing Verizon's charges to Globaleyes for the Facilities is Section 5.6 of Appendix 1. Subsection 5.6.3 was substantively identical to its counterpart in the First ICA, providing as follows:

> Special Access. Verizon will charge special access rates from the applicable Verizon intrastate access tariff. DS1 charges will be reduced to reflect the proportionate share of the facility that is used for transport of Local, optional EAS and IntraLATA Toll Traffic originated by [Verizon]. The Parties will negotiate an initial factor representative of the proportionate share of the facilities. This factor will be updated quarterly in like manner or as the Parties otherwise agree.

(Second ICA, Appendix 1 at § 5.6.3.)

13. The parties also agreed in Section 5.6 that "Only Local Traffic and IntraLATA Toll Traffic will be used for calculation of this compensation." (Second ICA, Appendix 1 at § 5.6.) In the definition for Local Traffic, the Second ICA further provided that "Local Traffic does not include Enhanced Service Provider (ESP) and Internet Service Provider (ISP) traffic, including, but not limited to, Internet traffic . . . and Internet Protocol (IP) based voice of fax telephony. (Second ICA, Article 1, Appendix A at p. 44 (emphasis added).) "Internet Traffic," in turn, was defined as "[t]raffic that is transmitted to or returned from the Internet at any point during the duration of the transmission." (Second ICA, *Id.* at p. 43.) It also defined "Enhanced Service Provider (ESP) / Internet Service Provider (ISP) Traffic" as "[t]raffic bound to any Enhanced Service Provider or Internet Service Provider. ESP/ISP Traffic is separate and distinct from Local Traffic." (*Id.*)

14. The Second ICA, like the First ICA, also required Globaleyes to provide Verizon with written notice of any billing dispute within six (6) months of the corresponding billing statement date. The parties again agreed that any billing dispute not raised within such six-month period would be deemed waived. (Second ICA, Appendix 1 at § 4.3.3; VZ-APP, Doc. B at p. 13.)

15. The Second ICA, like the First ICA, was submitted to and approved by the ICC.

16. On the date that the debtor's bankruptcy petition was filed, the Second ICA was still in full force and effect.

17. During the pendency of the bankruptcy, Globaleyes did not disclose any billing disputes or associated contingent and unliquidated claims against Verizon, nor were any such disputes or claims listed in the debtors' sworn bankruptcy Schedules and Statement of Financial Affairs.

18. Globaleyes admits—and for purposes of this proceeding Verizon has stipulated—that while 99.97% of the traffic passing over the Facilities during the pre-petition period was originated by Verizon, 99.949% of that traffic was ISP/Internet traffic.

19. Therefore, after subtracting the 0.03% of traffic admittedly originated by Globaleyes, the "proportionate share" of the Facilities that were used during the pre-petition period for the transport of traffic originated by Verizon was 0.021% (twenty-one one-thousandths of one percent).

20. Globaleyes admits in its Amended Complaint that, from the very outset of its relationship with Verizon in 1999, it believed that at

least 95% of the traffic being transported over the Facilities would be "incoming" to Globaleyes, and thus originated by Verizon.

21. During the pre-petition period governed by the First and Second ICAs, whether Globaleyes' special access charges had been reduced or discounted by Verizon was apparent on the face of each of the monthly invoices for the Facilities that Verizon provided to Globaleyes. Those invoices indicated to Globaleyes that it was being charged 100% of the monthly special access charge and receiving no discount or reduction.

22. During the pre-petition period governed by the First and Second ICAs, upon receiving these statements, at no time did Globaleyes provide Verizon with written notice of any disputes. Not until it filed pleadings seeking to re-open the bankruptcy case and initiate this adversary proceeding in August of 2006, almost three years after the Petition Date, did Globaleyes notify Verizon of a billing dispute concerning its purported entitlement to a reduction of special access charges incurred during the pre-petition period and based on the proportion of traffic originated by Verizon.

23. After the Petition Date, Globaleyes negotiated and entered into a third ICA with Verizon, effective as of July 21, 2004 (the "Third ICA"). Globaleyes elected to adopt an ICA that Verizon had previously negotiated with another carrier (Bullseye Telecom, Inc.).

24. The provision of the Third ICA governing Verizon's charges to Globaleyes for the Facilities is Section 2.4, and is materially different from the corresponding provisions in the First and Second ICAs. Sub-section 2.4.16 of the Third ICA provides, in pertinent part:

> When the Parties implement Two-Way Interconnection Trunks, the Parties will work cooperatively to calculate a Proportionate Percentage of Use ("PPU") factor for each facility on which the Two- Way Interconnection Trunks ride, based on the total number of minutes of traffic that each Party sends over the Two-Way Interconnection Trunks riding on that facility. [Globaleyes] will pay a percentage of Verizon's monthly recurring charges for each facility on which the Two-Way Interconnection Trunks ride equal to [Globaleyes'] percentage of use of the facility as shown by the PPU.

(Third ICA at § 2.4.16.).

25. Thus, while the First and Second ICAs imposed monthly

charges onGlobaleyes for the Facilities and then provided for a reduction of those charges based on the percentage of certain types of traffic originated by Verizon, the Third ICA provided that Globaleyes was responsible only for the proportion of Verizon's monthly charges that corresponded with the percentage of traffic that Globaleyes originated.

26. In addition, the Third ICA – in contrast to the First and Second ICAs does not contain any provision excluding ISP/Internet Traffic from the calculation of Globaleyes' proportionate obligation on Verizon's monthly charges for the Facilities.

27. This Court entered its Final Decree and closed this bankruptcy case on January 20, 2005.

28. In the spring of 2005, representatives of Globaleyes raised certain inquiries with their Verizon account manager, Jeff Carr, concerning the way they were being billed for the Facilities under the Third ICA and whether they were entitled to any discount or reduction of Verizon's monthly charges. As a result of these inquiries, Mr. Carr reviewed the applicable provisions of the Third ICA, and commissioned and reviewed the results of an analysis of the volume and direction of traffic that was then being carried over the Facilities.

29. By May of 2005, Mr. Carr had concluded that Verizon was not billing Globaleyes for the Facilities in the manner provided in applicable sub-section 2.4.16 of the Third ICA, and, consequently, Globaleyes was likely entitled to a refund of a percentage of the charges that it had previously paid to Verizon under that agreement. Accordingly, on or about May 24, 2005, Mr. Carr advised representatives of Globaleyes during a telephone conference that they should submit a billing dispute to Verizon requesting a refund on this basis.

30. Based on Mr. Carr's recommendation, Globaleyes thereafter submitted their dispute to Verizon on May 25, 2005. Verizon subsequently granted the dispute issued Globaleyes a refund of overpayments made for the Facilities under Subsection 2.4.16 of the Third ICA.


E.      Analysis


*1. The bankruptcy court correctly interpreted the billing provisions of the First and Second Interconnection Agreement (1999 GTE Interconnection Agreement and 2002 Fuzion Interconnection Agreement).*

Globaleyes and Verizon are in agreement that the first and second Interconnection

Agreement—the 1999 GTE Interconnection Agreement (the "First ICA") (Am. Compl. Ex. 1; App. to Def.'s Br. in Opp. to Pltf.'s Mot. for Sum. J. & in Supp. of Def.'s Cross-Mot. for Summ. J. 4, No. 06-4129, Doc. 51) and the 2002 Fuzion Interconnection Agreement (the "Second ICA") (Am. Compl. Ex. 2; App. to Def.'s Br. on Summ. J. 21)—exclude internet traffic from the definition of local traffic. Charges under each contract are to be determined based upon the proportionate share of the trunks that are used for transporting traffic originated by Verizon to the exclusion of internet traffic. As a result, a call that was originated by a Verizon customer and transported through a line to Globaleyes would be considered as originated by Verizon and allocated as such to determine the proportional use of the trunks. Verizon charges the customer for the origination of the call while not sharing in the income generated from the call.

Globaleyes first obtained the facilities from Verizon's predessessor in name, GTE, under the First ICA dated on or about October 22, 1999. (Am. Compl. ¶ 11; *id.* Ex. 1; Aff. of Andrew Karn ¶ 4, No. 06-04129, Doc. 44, at 15, 15.) Charges to Globaleyes for the facilities[3] are found in sub-section 4.2.3 of Article V of the First ICA, which provides:

> Special Access and/or CLEC Dedicated Transport:  [Verizon] will charge special access and/or switched access rates from the applicable [Verizon] intrastate access tariff. Charges will be reduced to reflect the proportionate share of the facility that is used for transport of traffic originated by [Verizon]. The Parties will negotiate an initial factor representative of the proportionate share of the facilities. This factor will be updated quarterly in like manner or as the Parties otherwise agree.

(App. to Def.'s Br. on Summ. J. 19.)

Section 4.2, also provided, however, that "Only Local Traffic and IntraLATA Toll Traffic will be used for calculation of this compensation. *ESP/ISP Traffic is excluded from this compensation . . . ."* (*Id.* at 18 (emphasis added)). ESP/ISP Traffic, in turn, was defined elsewhere in the First ICA

---

[3] The term "facilities" is a term of art used in the contracts. For purposes of this order, it generically refers to the infrastructure Verizon uses to accommodate Gloablaeyes's traffic as well as its own.

as "[t]raffic bound to any Enhanced Service Provider or Internet Service Provider." (*Id.* at 16.)

Consequently, the First ICA called for Globaleyes to have its monthly special access charge—a recurring monthly rate established by the applicable Verizon tariff—"reduced to reflect the proportionate share of the facility that is used for transport of traffic originated by [Verizon]," it also expressly stipulated that any ESP/ISP Traffic would be excluded from that assessment. This meant the First ICA provided for monthly special access charges owed by Globaleyes to be reduced in proportion to its share of the entire circuit used to transport traffic, to the exclusion of ESP/ISP traffic, originated by Verizon. The First ICA did not oblige either party to measure or analyze the volumes, types or directions of telecommunications traffic being carried over the Facilities.

Effective of June 21, 2002 (the "Second ICA") between.[4] Globaleyes and Verizon took effect. (Am. Compl. ¶ 11; *id.* Ex. 2; Aff. of Andrew Karn ¶ 5.) Sub-section 5.6.3 of Appendix 1, which was substantively identical to its counterpart in the First ICA, controlled Verizon's charges to Globaleyes:

> Special Access. Verizon will charge special access rates from the applicable Verizon intrastate access tariff. DS1 charges will be reduced to reflect the proportionate share of the facility that is used for transport of Local, optional EAS and IntraLATA Toll Traffic originated by [Verizon]. The Parties will negotiate an initial factor representative of the proportionate share of the facilities. This factor will be updated quarterly in like manner or as the Parties otherwise agree.

(App. to Def.'s Br. on Summ. J. 30–31.)

As in the First ICA the parties also expressly agreed in Section 5.6 that "Only Local Traffic and IntraLATA Toll Traffic will be used for calculation of this compensation." (*Id.* at 30.) In the definition for Local Traffic, the Second ICA further provided that "Local Traffic does not include Enhanced Service Provider (ESP) and Internet Service Provider (ISP) traffic, including, but not

---

[4] Globaleyes elected to adopt an ICA that Verizon had previously negotiated with another carrier, Fuzion Wireless Communications, Inc., as permitted under the Telecommunications Act of 1996. Thus the reference to The Fuzion Agreement in appellants brief.

limited to, Internet traffic . . . and Internet Protocol (IP) based voice of fax telephony. (*Id.* at 27.) "Internet Traffic," in turn, was defined as "[t]raffic that is transmitted to or returned from the Internet at any point during the duration of the transmission." (*Id.* at 26.) It also defined "Enhanced Service Provider (ESP) / Internet Service Provider (ISP) Traffic" as "[t]raffic bound to any Enhanced Service Provider or Internet Service Provider. ESP/ISP Traffic is separate and distinct from Local Traffic." (*Id.* at 25.)

Consequently, as with the First ICA, the Second ICA required the Globaleyes monthly special access charge "reduced to reflect the proportionate share of the facility" used for transport of traffic originated by Verizon, but expressly stipulated that any ESP/ISP Traffic, including Internet Traffic, would be excluded from that assessment. In other words, the Second ICA also provided for monthly special access charges owed by Globaleyes to be reduced in accordance with the proportionate share of the *entire* circuit used to transport traffic, *other than Internet and other ESP/ISP Traffic*, originated by Verizon. As with the First ICA, the Second ICA also did not oblige either party to measure or analyze the volumes, types or directions of telecommunications traffic being carried over the Facilities.

Gloabaleyes and Verizon have stipulated that 99.97% of the traffic passing over the Facilities during the pre-petition period was originated by Verizon. But 99.949% of that 99.97% was ISP/Internet traffic. (App. to Def.'s Br. on Summ. J. 37, 51–55) that must be excluded in determining the pool of traffic in dispute. That leaves .051% as non ISP/internet traffic and the universe of traffic in dispute after a clear reading of the ICA's. After subtracting the 0.03% of traffic admittedly originated by Globaleyes (100%-99.97%), the "proportionate share" of the Facilities that was used during the pre-petition period for the transport of traffic—specifically excluding ISP/Internet traffic per the clear contract language—originated by Verizon equals .051% minus 0.03% or a total of 0.021%.

This conclusion ought not surprise Globaleyes which admitted in its Amended Complaint that, from the very outset of its relationship with Verizon in 1999, it believed that at least 95% of the traffic being transported over the Facilities would be "incoming" to Globaleyes, and thus originated by Verizon. (Am. Compl. ¶ 10.) Moreover, during the entire pre-petition period governed by the First ICA and the Second ICA, whether Globaleyes special access charges had been reduced or discounted by Verizon in any way was readily apparent on the face of each of the monthly billings Verizon provided to Globaleyes. The billings to Globaleyes indicated it was being charged 100% of the monthly special access charge and was not receiving any discount or reduction whatsoever. (Decl. of William E. Munsell ¶¶ 7–8, No. 06-4129, Doc. 52.)

Globaleyes entered into a third ICA (referred to in the briefs and record as the "Bullseye" agreement) with Verizon, effective as of July 21, 2004 (the "Third ICA")[5] after the Petition Date, and in the course of its effort to reorganize during the Bankruptcy Case. The provision of the Third ICA governing Verizon's charges to Globaleyes for the Facilities is sub-section 2.4.16 and is materially different from the corresponding provisions in the First and Second ICAs:

> When the Parties implement Two-Way Interconnection Trunks, the Parties will work cooperatively to calculate a Proportionate Percentage of Use ("PPU") factor for each facility on which the Two-Way Interconnection Trunks ride, based on the total number of minutes of traffic that each Party sends over the Two-Way Interconnection Trunks riding on that facility. [Globaleyes] will pay a percentage of Verizon's monthly recurring charges for each facility on which the Two-Way Interconnection Trunks ride equal to [Globaleyes'] percentage of use of the facility as shown by the PPU.

(App. to Def.'s Br. on Summ. J. 74–75.)

Where the First and Second ICAs imposed monthly charges on Globaleyes for the Facilities and then provided for a reduction of those charges based on the percentage of certain types of traffic over the Facilities that was *originated by Verizon*, the Third ICA created an entirely different

---

[5]     Globaleyes and Verizon adopted an ICA that Verizon had previously negotiated with another carrier, Bullseye Telecom, Inc.

arrangement, under which Globaleyes was responsible only for the proportion of Verizon's monthly charges that corresponds with the percentage of traffic *originated by Globaleyes*. Unlike the First and Second ICAs, the Third ICA lacks any provision excluding ISP/Internet Traffic from the calculation of Globaleyes' proportionate obligation on Verizon's monthly charges for the Facilities.

The Bankruptcy Court entered its final decree closing the Bankruptcy Case in late January 2005. *In re Globaleyes, Inc.*, No. 03-42797 (Bankr. S.D. Ill. Jan. 20, 2005) (Doc. 105). Months later, in the spring of 2005, representatives of Globaleyes raised certain inquiries with their Verizon account manager, Jeff Carr, concerning the way they were being billed for the Facilities under the Third ICA, and whether they were entitled to any discount or reduction of Verizon's monthly charges. By May of 2005, it appeared to Mr. Carr that Verizon was not billing Globaleyes for the Facilities in the manner provided in sub-section 2.4.16 of the Third ICA, and that Globaleyes was likely entitled to a refund of a percentage of the charges that it had previously paid to Verizon under that agreement. Around May 24, 2005, Mr. Carr advised representatives of Globaleyes during a telephone conference that they should submit a billing dispute to Verizon requesting a refund on this basis, and advising them of the proper procedure for doing so. (Decl. of Jeffrey T. Carr ¶ 5, No. 06-4129, Doc. 53; Am. Compl. ¶ 15; Affid. of Aken ¶ 12.) Globaleyes submitted the dispute that Mr. Carr had recommended, and in the fall of 2005, Verizon granted the dispute and issued Globaleyes a refund of overpayments made for the Facilities under sub-section 2.4.16 of the Third ICA. Adv. No. 06-4129 (Decl. of Carr ¶¶ 6-7; Am. Compl. ¶ 18; Affid. of Aken ¶ 15.)

Globaleyes argues in partial support of Count II of its Amended Complaint that because Verizon conceded a billing error and refunded certain charges for the Facilities that Globaleyes paid under the Third ICA, which did not take effect until the post-petition period, it is entitled to a similar credit or refund credit for the charges that accrued under the First and Second ICAs that were in effect prior to the Petition Date, and that comprised the bulk of Verizon's Claim No. 13.

14

But this argument is misplaced because the provision governing Verizon's charges for the Facilities in the Third ICA materially differed from the corresponding provisions in the First and Second ICAs that were in effect prior to the Petition Date. The Third ICA calculated Globaleyes' proportionate share of Verizon's monthly charges based on Globaleyes' use of the Facilities, and unlike the First and Second ICAs, did not exclude ISP/Internet Traffic from the equation.

The First and Second ICAs provided for a reduction of the fixed monthly rate charged for the Facilities based on both the direction and the types of traffic carried over them and Verizon acknowledges it originated the vast majority of that traffic in the pre-petition period. It is clear, however, under the unambiguous terms of the First and Second ICAs, the only relevant measure is the proportion of traffic carried over the Facilities as a whole that was both originated by Verizon and was not ISP/Internet traffic.

The parties stipulated that 99.97% of the traffic passing over the Facilities during the pre-petition period was originated by Verizon; and 99.949% of that traffic was ISP/Internet traffic. As calculated above, the proportionate share of the Facilities that was used prior to the Petition Date for the transport of traffic that was both originated by Verizon and *not* ISP/Internet Traffic and governed by the First and Second ICAs was an infinitesimal 0.021%. Applying this percentage to the $197,957.67 portion of Claim No. 13 that is comprised of charges for the Facilities, Globaleyes was entitled to a reduction of the face amount of Claim No. 13 in the amount of $41.57.

Globaleyes additionally relies on the standards and obligations imposed on ILECs such as Verizon by arguing the following:

> The requirement for proportionate sharing of these kinds of costs also is consistent with Congressional intent that an ILEC, such as Verizon, could not require that a CLEC, such as Globaleyes, pay for essentially the entire cost of an interconnection trunk, particularly when the ILEC was generating substantially all of the traffic across the trunk. This Congressional intent also is reflected in the provisions of 47 U.S.C. §252, which provides that "pricing standards" for interconnection trunks, *inter alia*, must be "nondiscriminatory" and only result in a "reasonable profit." 47 U.S.C. §252(d)(1).

15

(Br. of Appellant 4–5.) It is puzzling why Globaleyes persists in this argument after conceding at oral argument on the parties' cross-motions for summary judgment the inapplicability of the obligations imposed under the under the Communications Act of 1934 (the "Act"), 47 U.S.C. §§ 251–261 (2006) (as amended by the Telecommunications Act of 1996, Pub. L. No. 104-104, § 101(a), 110 Stat. 56, 61–79 (1996)) and 47 C.F.R. § 51.709 to the First and Second ICAs in this case. *Globaleyes II*, No. 06-4129, slip op. at 11–12. The Court, for sake of completeness will address them.

The provisions under the Act upon which Globaleyes rests, do not apply to agreements— such as the First and Second ICAs in this case—that were arrived at through voluntary negotiation. Rather, they apply only to agreements between carriers that are the product of compulsory arbitration under the Communications Act of 1934. Section 252(a)(1) of the Act, which governs "Agreements Arrived At Through Negotiation," provides, in pertinent part:

> Upon receiving a request for interconnection, services, or network elements pursuant to section 251 of the title, an incumbent local exchange carrier may negotiate and enter into a binding agreement with the requesting telecommunications carrier or carriers without regard to the standards set forth in subsections (b) and (c) of section 251 of this title.

47 U.S.C. § 252(a)(1). Section 252(a)(1) is conspicuous by its absence in the Brief of Appellant.

Globaleyes also asserts that 47 C.F.R. § 51.709 takes precedence over pricing provisions of the First and Second ICAs. Disregarding for a moment the insurmountable obstacle presented in § 252(a)(1), Gloabaleyes faces another hurdle—§ 51.709 is in Subpart H of Part 51 of the Code, which earlier provides that "[t]he provisions of this subpart apply to reciprocal compensation for transport and termination of telecommunications traffic between LECs and other telecommunications carriers." 47 C.F.R. § 51.701(a) (2009). Globaleyes has conceded from the beginning that "this case does not involve the issue of 'reciprocal compensation.'" (Pltf.'s Br. on Summ. J. 2 n.1.; *see also* Br. of Appellant 9 ("[T]he respective companies were not going to be billing

each other for Reciprocal Compensation.").)

Globaleyes' contention that every interconnection agreement must comply with 47 C.F.R. § 51.709 is inaccurate. "[A] state commission shall have authority to approve an interconnection agreement adopted by negotiation even if the terms of the agreement do not comply with the requirements of this part." 47 C.F.R. § 51.3. The parties were recipients of this clause when they filed, on December 6, 1999, a Joint Petition that Globaleyes and Verizon (then GTE) submitted to the ICC in order to obtain its approval of the First ICA where the parties made the following joint representations to the ICC:

> 3.      The proposed Agreement . . . was negotiated voluntarily between [Verizon] and Globaleyes. Accordingly, [Verizon] and Globaleyes are requesting approval of the Agreement pursuant to 47 U.S.C. [§§] 252(a)(1) and 252(e).

> 5.      Nor do agreements voluntarily negotiated between or among parties have to comply with the standards set forth in 47 U.S.C. § 251(b) & (c) or the pricing standards set forth in 47 U.S.C. § 252(d).

(Br. in Supp. of Def.'s Cross-Mot. for Summ. J., Ex. A, at 16, No. 06-4129, Doc. 62.) This Joint Petition was signed on Globaleyes' behalf, and under oath, by its principal, Andrew Aiken. (*Id.* at 18.)

In summary Verizon and Globaleyes, as they were freely permitted to do under the Act, negotiated business terms at arms length and to entered into binding First and Second ICAs agreements voluntarily, without any regard to the standards or regulations that would apply if the carriers were forming an agreement through arbitration before the governing state public service commission Verizon's charges under the First and Second ICAs are not governed or superseded by 47 C.F.R. § 51.709.

> ***2.      The bankruptcy court did not err in concluding that from the inception of the relationship in 1999, and throughout the pre-petition period, Globaleyes never***

*submitted a billing dispute as required by the First and Second ICAs and as a result, pursuant to the terms of the terms of the First and Second ICAs, any disputes were waived or time barred because they were not raised within the requisite six (6) month period.*

Both the First and Second ICAs contained a provision requiring Globaleyes to provide Verizon with written notice of any billing dispute within six (6) months of the corresponding billing statement date, and stipulating that any billing dispute not raised within that six-month period would be deemed waived. (App. to Def.'s Br. on Summ. J. 17, 29.)

It was not until almost three years after the Petition Date that Globaleyes first notified Verizon of a billing dispute concerning its claimed entitlement to a reduction of special access charges incurred during the pre-petition period and based on the proportion of traffic originated by Verizon.

Under Globaleyes' reading of the First and Second ICAs, it believed or expected from the beginning of its relationship with Verizon that its monthly charge for the Facilities should or would be reduced by approximately 95%. But at the same time, the monthly invoice from Verizon to Globaleyes plainly indicated, on its face, that Globaleyes was being charged the entire monthly access charge for the Facilities, with no reduction or credit. Verizon's charges for the Facilities were billed each month in advance, so the last Verizon invoice including charges for any portion of the pre-petition period would have been issued prior to the November 21, 2003 Petition Date. Consequently, the six-month period for disputing the charges on that most recent invoice expired no later than May of 2004. It is undisputed that Globaleyes never notified Verizon of any dispute within the contractual 6 month time limitation concerning its purported entitlement to a traffic-based reduction of special access charges for the Facilities incurred during the pre-petition period. The issue never surfaced until Globaleyes filed pleadings seeking to re-open its Bankruptcy Case and initiate this adversary proceeding in August of 2006.

By then, Globaleyes claims for improper billing as to the most current pre-petition invoice

had run under the applicable provisions of the First and Second ICAs. For this additional and independent reason, the Bankruptcy Court properly granted summary judgment in favor of Verizon and allowed its Claim No. 13 in its entirety.

Globaleyes makes a bald assertion that it should be absolved from the 6 month limitation due to the discovery rule and fraud on the part of Verizon. The record, however, is devoid of any evidence of false statement made by Verizon. To the contrary, it appears that as to the overcharging that occurred on the Third ICA and which resulted in a refund to Globaleyes—and as Globaleyes has readily admitted—it was Verizon account manager, Jeff Carr, was the person who alerted Globaleyes to the issue and recommended that it submit a dispute claiming the refund.

### 3.    The bankruptcy court correctly dismissed Counts I and III of the amended complaint due to lack of subject matter jurisdiction.

In the present case, Globaleyes was no longer a debtor, and the bankruptcy estate no longer existed, when it filed its adversary proceeding against Verizon. The Bankruptcy Court order dismissed Counts I and III of Globaleyes' Amended Complaint for lack of subject matter jurisdiction. *Globaleyes I*, No. 06-04129. For a Bankruptcy Court to have subject matter jurisdiction, a cause of action must (a) arise under Title 11, (b) arise in a case under Title 11 or (c) be related to a case under Title 11. 28 U.S.C. § 1334(b).

Globaleyes framed its entire Amended Complaint as one "brought under the [turnover] provisions of 11 U.S.C. § 542(a)." Count I asserted a state law claim for pre-petition breach of contract while Count III based on the same factual allegations, claimed relief under the Illinois Consumer Fraud and Deceptive Business Practices Act. Both claims sought money damages based solely on state law, and do not constitute "turnover" proceedings or otherwise "arise under" the Bankruptcy Code. *See, e.g.*, *In re Wood*, 825 F.2d 90, 97 (5th Cir. 1987) (noting that a proceeding does not "arise under" Title 11 if it does not invoke a substantive right, created by federal bankruptcy law,

that could not exist outside of bankruptcy); *Kovalchick v. Dolbin* (*In re Kovalchick*), No. 3:06cv1066, 2006 WL 2707428, at *4 (M.D. Pa. Sept. 19, 2006) (state law claims do not fall within bankruptcy court's "arising under" jurisdiction because they do not invoke substantive rights provided by Title 11); *Satelco, Inc. v. N. Am. Publishers, Inc.* (*In re Satelco, Inc.*), 58 B.R. 781, 784–87 (Bankr. N.D. Tex. 1986) (noting that an action to recover pre-petition accounts receivable or similar money damages under state law is neither a "turnover" proceeding nor a core proceeding "arising under" Title 11).

Similarly, Counts I and III did not "arise in" a bankruptcy case. The plan of reorganization in Globaleyes' Chapter 11 case was confirmed almost 2 years before the instant proceeding was initiated. The confirmation of a Chapter 11 plan ends the existence of the bankruptcy estate, and post-confirmation adversary proceedings cannot therefore qualify as "arising in" a case under Title 11. *Lawndale Steel Co. v. Fairlane Steel, Inc.* (*In re Lawndale Steel Co.*), No. 90 A 706, 1991 WL 242977, at *1 (Bankr. N.D. Ill. 1991 May 2, 1991); *see also, e.g.*, 11 U.S.C. § 1141(b) (2006) ("[T]he confirmation of a plan vests all of the property of the estate in the debtor."); *Zerand–Bernal Group, Inc. v. Cox* (*In re Cary Metal Prods., Inc.*), 158 B.R. 459, 463 (N.D. Ill. 1993), *aff'd*, 23 F.3d 159 (7th Cir. 1994) (affirming bankruptcy court's dismissal, for lack of subject matter jurisdiction, of adversary proceeding brought five years after confirmation of plan); *Portfolio Lease Funding Corp. No. 1 v. Seagate Tech., Inc.* (*In re Atl. Computer Sys., Inc.*), 163 B.R. 704, 707 (Bankr. S.D.N.Y. 1994) (after confirmation, there is no debtor and no estate). Moreover, even if confirmation had not yet occurred, Counts I and III did not invoke the Court's "arising in" jurisdiction because they were purely state law claims that "could exist without filing a bankruptcy petition at all." *Kovalchick*, 2006 WL 2707428, at *4; *see also, e.g.*, *Stoe v. Flaherty*, 436 F.3d 209, 216 (3d Cir. 2006) (noting that matters "arise in" bankruptcy only "if they have no existence outside of the bankruptcy" (quoting *U.S. Trustee v. Gryphon at the Stone Mansion, Inc.*, 166 F.3d 552, 556 (3d Cir. 1999))). Clearly breach of contract cases and actions brought under the Illinois Consumer Fraud and Deceptive Business Practices Act have an existence independent of

bankruptcy.

Because the "estate" no longer existed, Counts I and III could not possibly be "core" proceedings under 28 U.S.C. § 157(b)(2)(E). Counts I and III of the Amended Complaint could not be core proceedings under any provision of 28 U.S.C. § 157(b) because such proceedings are expressly limited to those either "arising under title 11" or "arising in a case under title 11." Globaleyes' bankruptcy estate was dissolved upon confirmation of its plan, two years before the instant proceeding was even commenced. *See, e.g.*, *In re Pettibone Corp.*, 244 B.R. 906, 911 (Bankr. N.D. Ill. 2000) (noting that any provisions of § 157 that relate to the bankruptcy "estate" cannot confer core jurisdiction after plan confirmation, because at that point, as a matter of law, the estate no longer exists); *Lawndale Steel*, 1991 WL 242977, at *1, *4–5 (noting that post-confirmation claims asserting breach of contract and other state law causes of action are not core proceedings); *Zerand-Bernal Group*, 158 B.R. at 463–64 (noting that "critical consideration" in determining whether bankruptcy court has jurisdiction is whether outcome of the pending complaint would impact administration of the estate; thus, complaint asserted years after debtor's plan was confirmed, at which time estate no longer existed, could not possibly present core matters over which bankruptcy court had "arising under" or "arising in" jurisdiction).

Counts I and III of the Amended Complaint also did not fall within the Court's non-core "related to" jurisdiction under 28 U.S.C. §§ 1334(b) and 157(c), which in the Seventh Circuit is to be given a "conservative" and "narrow" interpretation. *Lawndale Steel*, 1991 WL 242977, at *3. Non-core "related to" jurisdiction is only to be exercised when resolution of the dispute at hand will have a tangible effect on the bankruptcy estate or the property to be distributed to creditors. *Id.* (citing *Elscint, Inc. v. First Wis. Fin. Corp.* (*In re Xonics, Inc.*), 813 F.2d 127 (7th Cir. 1987)); *see also, e.g.*, *Citizens Bank & Trust Co. v. Melrose Park Nat'l Bank* (*In re Crystal Mfg. & Packaging, Inc.*), 60 B.R. 816, 818 (N.D. Ill. 1986) (noting that courts "have uniformly held that, if an adversary proceeding does not

21

involve property in which the bankrupt's estate asserts an interest, and the resolution of the claim will not affect the administration of the estate, then the bankruptcy court has no subject matter jurisdiction to adjudicate the claim").

In the instant post-confirmation case, the all-important bankruptcy estate no longer exists, so the limits of "related to" jurisdiction are even more narrow and restrained. *See, e.g.*, *Federalpha Steel LLC Creditors' Trust v. Federal Pipe & Steel Corp.* (*In re Federalpha Steel LLC*), 341 B.R. 872, 880 (Bankr. N.D. Ill. 2006) (noting that after confirmation of a Chapter 11 plan, "related to" jurisdiction is "sharply reduced"). As elsewhere, courts in the Seventh Circuit have consistently held that post-confirmation jurisdiction can be exercised by a bankruptcy court only to the extent necessary to interpret or implement the plan. *See id.* at 880 (noting that post-confirmation "related to" jurisdiction appropriate only to ensure that reorganization plans are implemented and to protect estate assets devoted to implement the confirmed plan; once such assets have left the estate, the court's jurisdiction to decide disputes involving them lapses); *Spiers Graff Spiers v. Menako* (*In re Spiers Graff Spiers*), 190 B.R. 1001 (Bankr. N.D. Ill. 1996) (noting that the bankruptcy court retains limited jurisdiction after confirmation to insure proper execution and consummation of plan); *Lawndale Steel*, 1991 WL 242977, at *5 (noting that post-confirmation jurisdiction is limited to that necessary to implement or clarify ambiguities in the plan); *see also, e.g.*, *H&L Developers, Inc. v. Arvida/JMB Partners* (*In re H&L Developers, Inc.*), 178 B.R. 71, 76 (E.D. Pa. 1994) (noting that the bankruptcy court lacked jurisdiction over former debtors' post-confirmation state law claims; court does not retain jurisdiction over all post-confirmation disputes that might conceivably affect implementation of plan); *Zahn Assocs. v. Leeds Bldg. Prods., Inc.* (*In re Leeds Bldg. Prods., Inc.*), 160 B.R. 689, 690–91 (Bankr. N.D. Ga. 1993) (noting that bankruptcy court's role after confirmation is limited to matters involving execution, implementation or interpretation of plan's provisions and disputes requiring application of bankruptcy law; disputes arising out of contract and under state law do not fall under that limited

jurisdiction.)

Globaleyes' characterizing Counts I and III as counterclaims for recoupment and setoff against Verizon's proof of claim is unavailing. First, that they are not pleaded as such anywhere in the Amended Complaint. (Br. of Appellant 14–16.) In actuality, they sought affirmative monetary relief over and above the disallowance of its proof of claim and did not simply seek to reduce or eliminate Verizons proof of claim. As such these were not claims over which the Bankruptcy Court had subject matter jurisdiction at the post-confirmation stage of the case. Globaleyes claims that *NRG Options, Inc. v. Ruthrauff, Inc.* (*In re Ruthrauff, Inc.*), No. 03-35738 BM, 2005 WL 1420765 (Bankr. W.D. Pa. 2005), which it characterizes as "remarkably similar" to the present case, supports the assertion that the bankruptcy court had post-confirmation jurisdiction to address the debtor's claims for "affirmative relief . . . of recoupment and setoff." (Br. of Appellant 15.) *Ruthrauff* does address a post-confirmation jurisdictional challenge but unlike this case involved only a claim objection. 2005 WL 1420765 at *2. The debtor in *Ruthrauff* did not assert any claims against the creditor for affirmative monetary relief, a key fact the court expressly points out. *Id.* at *9 ("[The] debtor has not sought such relief . . . and appears satisfied with reducing the allowed amount of [creditor's] claim in this case to zero."). Instead, the debtor's recoupment and setoff contentions were effectively asserted as defenses to the proof of claim that was the subject of the objection. *Id.* The court in *Ruthrauff* thus had no occasion whatsoever to consider whether it had post-confirmation subject matter jurisdiction to consider state law claims for affirmative monetary relief asserted by the debtor, and Globaleyes' suggestion that the *Ruthrauff* court ruled in the affirmative on that question, or that that case even involved a debtor's right "to affirmatively recover . . . amounts due" (Br. of Appellant 15) is unsupported by it.

Globaleyes also asserts that judicial economy suggests treating Counts I and III as core proceedings, but attractive and convincing considerations of judicial economy cannot confer subject matter jurisdiction on a Bankruptcy Court if it does not otherwise exist. The existence and scope of bankruptcy jurisdiction is a matter of legislation by Congress, 28 U.S.C. § 1334(b), and nowhere in the controlling statute or case law is there any suggestion that the requirements for such jurisdiction can be entirely disregarded by a Bankruptcy Court in the interest of judicial economy.

The dismissal of Counts I and III for lack of subject matter jurisdiction was correct.

### 4.	The bankruptcy court correctly overruled Globaleyes objection to the proof of claim filed by Verizon North.

Verizon's Claim No. 13 in the Bankruptcy Case amounted to $203,193.00 of which $197,957.67 were unpaid pre-petition charges for Globaleyes' use of the Facilities that accrued prior to the Petition Date but were never paid by Globaleyes. Globaleyes has not asserted any basis for an objection to the remaining $5,235.33 of Claim No. 13.

Globaleyes' objection to Claim No. 13 was based on its contention that it was entitled to a reduction of Verizon's charges for the Facilities, essentially by 100%, based on the percentage of traffic carried over the Facilities that was originated by Verizon. As discussed above, Globaleyes became entitled to such a reduction only upon execution of the Third ICA with Verizon during the Bankruptcy Case. The express terms of the First and Second ICAs in effect prior to the Petition Date did not provide for Globaleyes to receive that reduction so the Bankruptcy Court was correct in overruling Globaleyes objection to Verizons proof of claim.

F. Conclusion

Having carefully reviewed the record before it, the Court **AFFIRMS** the Orders of the Bankruptcy Court dismissing Counts I and III and granting summary judgment on Count II. Judgment shall enter accordingly, and the case is now closed.

**IT IS SO ORDERED.**

**DATED March 1, 2010.**

<u>**s/ Michael J. Reagan**</u>
**MICHAEL J. REAGAN**
**United States District Judge**